UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH BULLOCK,

               Plaintiff,

v.

CITY OF GROSSE POINTE PARK, CITY
OF DETROIT, JAMES VOGLER, and FRANK
CARROLL,

               Defendants.

Case No.  25-14081
Judge:

---

SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
HAYDEN PENDERGRASS (P86888)
Akeel & Valentine, PLC
*Attorneys for Plaintiff*
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084-4736
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
hayden@akeelvalentine.com

---

## PLAINTIFF'S COMPLAINT

**NOW COMES** Plaintiff, KENNETH BULLOCK, by and through his undersigned counsel, AKEEL & VALENTINE, PLC, and for his Complaint against Defendants, states as follows:

## NATURE OF THIS ACTION

1.     Over the past two decades, a substantial body of evidence has emerged revealing a disturbing criminal enterprise that operated within and alongside the Detroit Police Department, involving corrupt police officers, complicit mechanics and collision-repair shops, tow-truck operators, and other criminal actors. This enterprise employed an intricate scheme that included the theft of vehicles, the intentional damaging of those vehicles, towing them to cooperating repair shops, generating false or fabricated police reports in exchange for bribes, retagging vehicles with fraudulent VINs, and submitting false insurance claims for substantial payouts.

2.     Many details of this scheme have been documented in state and federal judicial opinions, sworn testimony, court transcripts, public filings, and criminal prosecutions, resulting in police officers being stripped of their badges, business owners being convicted and imprisoned, and widespread acknowledgment of systemic corruption. Yet while many perpetrators were ultimately held accountable, innocent individuals were also exploited and used as scapegoats to shield the enterprise from detection.

3.     One such victim was Plaintiff Kenneth Bullock. Mr. Bullock unknowingly purchased one of these stolen and damaged vehicles from a collision repair shop (long-known by the defendants to be part of this criminal network),

repaired the vehicle, and attempted to sell it online. When members of the criminal enterprise became aware that Mr. Bullock's sale threatened to expose the fraudulent chain of custody and insurance scheme, Defendants acted to silence that risk— orchestrating Mr. Bullock's arrest, prosecution, and conviction on charges they knew were false, thereby preserving the enterprise at the expense of an innocent man's freedom.

4.      This civil rights action arises from the wrongful arrest, prosecution, and nearly twelve-year imprisonment of Plaintiff Kenneth Bullock—an innocent man convicted only because the Defendants suppressed critical exculpatory evidence, concealed a directly related prior crime and suspect, withheld pertinent information relating to the criminal enterprise, and employed an unduly suggestive and constitutionally defective identification procedure.

5.      Unbeknownst to Mr. Bullock or his defense counsel, the carjacking for which he was falsely charged and maliciously prosecuted for occurred mere hours after, and just minutes away from, a strikingly similar carjacking involving a silver Dodge Charger. That first incident, which was captured on video, involved assailants who matched the descriptions in the second incident, and the silver Charger (which was also identified as an instrumentality used in the second incident) was later recovered from an individual who belonged to the same group as the person who ultimately confessed to committing both crimes. Yet none of this information was

ever disclosed to Mr. Bullock, his attorney, or the jury. Defendants hid the prior incident, the arrest made in that case, and the video footage that directly undermined the prosecution's theory.

6.      Rather than pursue the obvious leads linking the two incidents, Defendants instead manufactured a case against Mr. Bullock by conducting an impermissibly suggestive live lineup designed to yield a false identification. Defendant Sergeant Frank Carroll—who admitted that in his 24 years with the Detroit Police Department he had never been trained on how to conduct a constitutionally compliant lineup—placed Mr. Bullock in a lineup in which he was the only light-complexioned Black man and one of only two individuals of the described height. Carroll further admitted he knew that photographing a lineup is necessary to allow courts to evaluate suggestiveness, yet the Detroit Police Department did not require photographs, a practice that would inevitably result, and did in fact result, in false identifications. True to form, no photograph exists, and Carroll later altered the lineup sheet to create the false impression that he conducted a constitutionally compliant lineup.

7.      In addition, Defendants suppressed critical documentary evidence concerning the vehicle's true ownership and history—evidence that would have independently exonerated Mr. Bullock and exposed the impossibility of the prosecution's narrative. This included the Carfax report and related vehicle-history

records showing that, between the October 2011 alleged carjacking and the time Mr.
Bullock ultimately received the vehicle (more than a year later), the Charger had
passed through multiple hands, including through individuals connected to the same
criminal network responsible for the original carjackings. These records also
documented that the vehicle had been involved in multiple accidents, including a
collision on Interstate 94, long before Mr. Bullock ever encountered it. Had this
information been disclosed, it would have demonstrated that the vehicle traveled
through a chain of possessors wholly unrelated to Mr. Bullock, affirmatively
disproving any inference that he had participated in the carjacking. Instead,
Defendants concealed this evidence to preserve a false narrative and to secure a
conviction they knew lacked any legitimate basis.

8.     Compounding these violations, Defendants also suppressed evidence
showing that, at the time of Mr. Bullock's arrest, they were fully aware that he had
purchased the vehicle from the owner of a collision repair shop who had a
documented history of working with DPD officers to retag stolen vehicles, file false
insurance claims, and engage in other criminal conduct. Rather than disclose this
critical context—which would have shown that Mr. Bullock was an unwitting third-
party purchaser who fell victim to an already-active criminal enterprise—
Defendants concealed it. This information did not come to light until years later,
when the broader criminal scheme was exposed through publicly available records

and when certain officers and participants were themselves convicted. By hiding this information, Defendants deprived Mr. Bullock of the ability to demonstrate his innocence, identify the true criminal actors, and present the full truth to the jury.

9.     As a result of these constitutional violations—including the deliberate suppression of exculpatory evidence, the concealment of a related earlier crime and suspect, and the use of an unduly suggestive lineup—Mr. Bullock was wrongfully charged, wrongfully convicted, and wrongfully imprisoned for nearly twelve years.

## JURISDICTION & VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

11.     This Court has personal jurisdiction over the named Defendants because they either reside in the State of Michigan and/or do systematic and continuous business in Michigan.

12.     Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and because all named Defendants reside in this district.

## PARTIES

13.     Plaintiff, Kenneth Bullock, is a resident of Wayne County, State of Michigan.

14.     Defendant, City of Grosse Pointe Park, is a municipal corporation duly organized and existing by virtue of the laws of the State of Michigan and its principal place of business in Wayne County, Michigan. Defendant City of Grosse Pointe Park operated the Grosse Pointe Park Department of Public Safety ("GPPDPS") and employed its police officers, including Sergeant James Vogler, discussed below.[1] In and/or around 2011, the GPPDPS worked in conjunction with the Detroit Police Department ("DPD") on certain investigations, including through the multi-jurisdictional Arresting Car Thieves In Our Neighborhood ("ACTION") taskforce.[2]

15.     Defendant, City of Detroit, is a municipal corporation duly organized and existing by virtue of the laws of the State of Michigan and its principal place of business in Wayne County, Michigan. Defendant City of Detroit operated the Detroit Police Department and employed its police officers, including DPD Sergeant Frank Carroll discussed below. In and/or around 2011, the DPD worked in conjunction with the GPPDPS on certain investigations, including through the multi-jurisdictional ACTION taskforce.

16.     Defendant, James Vogler, was employed by the GPPDPS as a Sergeant and was a member of the ACTION taskforce. Vogler was acting under color of state

---

[1] Defendant City of Detroit and Defendant City of Grosse Pointe Park are referred to collectively herein as "City Defendants."
[2] The ACTION taskforce also included the City of Harper Woods Department of Public Safety.

law during the period in question. At all relevant times, Vogler was the officer in charge and worked independently and with the other defendants to violate Plaintiff's constitutional rights and ensure that he was convicted for a crime he did not commit. Vogler is being sued in his official and individual capacities.

17.    Defendant Vogler has previously been sued for violating the constitutional rights of Andrew Jackson Jr. by using excessive force in arresting Jackson Jr. in 2015 as part of the ACTION taskforce.

18.    Jackson Jr.'s federal civil rights lawsuit settled after this Court denied Defendant Vogler's motion for summary judgment. *See Jackson v. Dupuis*, No. 15-10678, 2018 WL 1122004 (E.D. Mich. Mar. 1, 2018).

19.    Defendant, Frank Carroll, was employed by the DPD as a Sergeant, was a member of the DPD's Commercial Auto Theft Unit, and was a member of the ACTION taskforce. Carroll was acting under color of state law during the period in question. Carroll also acted as the officer in charge at times in which Vogler was unavailable. Like Vogler, Carroll worked independently and with the other defendants to violate Plaintiff's constitutional rights and ensure he was convicted for a crime he did not commit. Carroll is being sued in both his official and individual capacities.[3]

---

[3] Defendants Vogler and Carroll are referred to collectively herein as the "ACTION Defendants."

20.     Defendant Carroll has previously been sued for violating the constitutional rights of Darryl Cain by unreasonably delaying a probable cause hearing after Defendant Carroll warrantless arrest of Cain in 2010 as part of the ACTION taskforce. Defendant Vogler, as well as LaFond (further discussed below), were also part of the criminal investigation of Cain.

21.     Cain's federal civil rights lawsuit settled after the Sixth Circuit reversed this Court's grant of summary judgment in Defendant Carroll's favor. *See Cain v. Carroll*, No. 16-2463, 2017 WL 4863194 (6th Cir. Oct. 5, 2017).

## COMMON ALLEGATIONS

22.     On October 20, 2011, Yulanda Russell was allegedly carjacked outside of her home by an assailant who allegedly stole her black 2012 Dodge Charger at gunpoint. The carjacker was allegedly aided by an accomplice driving what Russell initially described as a silver[4] Dodge Charger. The carjacker was described as a 5'9", 160 lbs. Black male, 20 years old, with a light complexion wearing a dark coat, and the accomplice was described as a 5'9", 160 lbs. Black male, 20 years old, with a dark complexion. Both suspects did not have facial hair. DPD Officer Ronald Hill responded to the scene. [**Ex. A,** 2nd October 2011 Incident].

23.     Unbeknownst to Plaintiff, hours earlier, and just 8 minutes from where Russell's vehicle was allegedly carjacked, Officer Hill had responded to a carjacking

---

[4] Subsequently, Russell described this vehicle as a "gray" Charger.

of a silver 2010 Dodge Charger by suspects matching the descriptions provided by Russell, which was caught on security camera footage. [**Ex. B**, 1st October 2011 Incident]. Approximately two weeks later, a man by the name of Alexander George was found in possession of the silver charger. [**Ex. C**, Stipulated Order Attached to Verified Complaint]. None of this information was disclosed to Mr. Bullock or presented at trial. Indeed, Plaintiff discovered the occurrence of this prior event and arrest years after he was wrongfully charged and convicted.

24.    In January 2012, a person named John Jackson fraudulently acquired an Illinois title and registration for the stolen black 2012 Charger using a VIN number for a 2011 Dodge Charger located in California. [**Ex. D**, Title Documents]. None of this information was disclosed to Mr. Bullock or presented at trial.

25.    In March 2012, John Jackson transferred the title for the black Charger to Araina Flowers using the false VIN number. That same day, the black 2012 Charger, driven by a friend of Flowers, Keenen Hester, was involved in a car accident on Interstate 94. [**Ex. C,** Crash Report Attached to Verified Complaint; **Ex. E,** Carfax Report]. None of this information was disclosed to Mr. Bullock or presented at trial.

26.    Subsequently, Dickow Dehko, owner of Advanced Expert Collision, came into possession of, and paid for, the allegedly stolen black 2012 Charger. Dehko never submitted a title transfer to the Michigan Secretary of State.

27.    In or around August 2012, Defendants allegedly received an anonymous tip that the black 2012 Charger was located at Advanced Expert Collision and/or Somerset Collision. Information regarding this anonymous tip was never disclosed to Mr. Bullock or presented at trial. Indeed, to date, no information pertaining to this tip (other than the alleged occurrence of it) has been provided to Mr. Bullock or his counsel.

28.    In late 2012, Dehko sold the black Charger to Mr. Bullock, and Mr. Bullock repaired the vehicle at his own expense. [**Ex. F**, Affidavit of Dickow Dehko; **Ex. G,** Affidavit of Theodore Dudley]. The title was transferred from Flowers to Mr. Bullock's mother, Angela Caldwell, using (unbeknownst to Mr. Bullock) the false VIN number.

29.    In January 2013, Mr. Bullock posted the black Charger for sale on Craigslist. After contacting Mr. Bullock to see the vehicle, on January 12, GPPDPS Officer Jessica Worrall and National Insurance Crime Bureau Agent Larry LaFond, posing as buyers, met Mr. Bullock and his friend, James Coleman, in a shopping center parking lot. Worrall and LaFond, with help from the Oakland County Sheriff's Auto Theft Unit, arrested Mr. Bullock and Coleman.

30.    Worrall and LaFond allegedly discovered that the black Charger's real VIN number had been covered by a sticker displaying the false VIN number.

31.    That same day, Defendant Vogler interrogated Mr. Bullock, who denied any knowledge that the black Charger was stolen.

32.    Mr. Bullock informed Defendants that he had purchased the vehicle from Dehko. Defendants knew that Dehko (and his family) had long engaged in a pattern of receiving stolen or damaged vehicles, bribing complicit police officers employed by the City Defendants, deceiving insurance companies, and retagging vehicles, but concealed such information from Plaintiff while simultaneously pursuing criminal charges against Plaintiff that they knew he did not commit.

33.    On January 14, 2013—nearly 15 months after the carjacking—Defendant Carroll allegedly took a statement from Russell.

34.    That same day, Defendant Carroll conducted a live lineup with five other individuals. Mr. Bullock was the only light complexioned Black man in the lineup and only one of two suspects who were 5' 9" in height. No photograph was taken of the lineup. [**Ex. H**, Lineup Sheet].

35.    Defendant Carroll subsequently doctored the Lineup Sheet in order to make it appear as though the lineup was not impermissibly suggestive.

36.    Defendant Carroll's doctoring of the Lineup Sheet was done to give the false impression that the lineup was constitutionally compliant and conducted in accordance with federal law.

37. Defendant Carroll admitted that, in his 24 years with DPD, he never received training on how to conduct lineups in accordance with federal law.

38. Other than Mr. Bullock, each individual placed in the lineup with Mr. Bullock deviated in significant ways from Russell's original description of the suspect.

39. For instance, no other individual was light-skinned, while others were significantly taller, shorter, heavier, smaller, or younger than Mr. Bullock.

40. The lineup was conducted in an impermissibly suggestive manner so to ensure that Mr. Bullock was wrongfully identified by Russell.

41. Defendant Carroll alleged that Russell identified Mr. Bullock "shockingly fast" and in less than 30 seconds. Russell, on the other hand, testified that she identified Mr. Bullock after a few minutes.

42. Mr. Bullock was charged with one count of carjacking (Count 1), one count of armed robbery (Count 2), one count of possession of a firearm by a felon (Count 3), and one count of use of firearm in a felony (Count 4).

43. On June 13, 2013, after a two-day trial wherein Worrall, LaFond, and Carroll, as well as Russell, testified, a jury found Mr. Bullock guilty on all four counts with less than an hour of deliberation.

44. At the July 8, 2013, sentencing hearing, Mr. Bullock's defense attorney brought a motion for a new trial.

45.    At the hearing, Dehko testified that he had purchased the black Charger in the fall of 2012 after it had been in accident on Interstate 94. Dehko testified further that, while he allegedly intended to repair the black Charger, he sold it to Mr. Bullock. [**Ex. I,** Sentencing Transcript].

46.    The state court denied Mr. Bullock's motion.

47.    Mr. Bullock was sentenced to between 30 and 70 years of imprisonment, a mandatory consecutive two-year sentence for committing a felony with a firearm, and time served for possession of a firearm as a felon.

48.    Five days after sentencing, the prosecution presented evidence that Dehko had used nine different aliases in the past and that he had numerous convictions for receiving and concealing stolen property in connection with his collision repair business.[5]

49.    Shortly thereafter, and unbeknownst to Plaintiff, criminal charges were then brought against Dehko for engaging in additional acts in furtherance of the

---

[5] In fact, Dickow Dehko had pleaded guilty to these charges in 2009 as part of a conspiratorial criminal enterprise with his brother, Norman Dehko (who pleaded guilty to insurance fraud conspiracy in 2012), in conjunction with DPD officers, who would arrange for the Dehko brothers to tow abandoned or damaged vehicles in exchange for bribes and forge police reports for the Dehko brothers to submit fraudulent insurance claims. [**Ex. J,** Organized Crime Ring Cracked in Detroit]. This criminal enterprise also resulted in the conviction of two DPD officers, Deonne Dotson and Kevin Schuh. *See United States v. Dotson*, No. 21-2826, 2022 WL 6973397 (6th Cir. Oct. 12, 2022); *People v. Schuh*, No. 291259, 2010 WL 5174513 (Mich. Ct. App. Dec. 21, 2010); *see also Allstate Ins. Co. v. Mercyland Health Servs., PLLC*, No. 18-13336, 2020 WL 9211074, at *16 (E.D. Mich. Oct. 13, 2020).

14

criminal and fraudulent insurance scheme that Plaintiff was wrongfully imprisoned for. [**Ex. K** – Dehko Warrant; **Ex. L** – Dehko Preliminary Hearing Transcript; **Ex. M** – Dehko Hearing Continued].

50.     In January 2015, the Michigan Court of Appeals upheld Mr. Bullock's convictions, which he challenged on ineffective assistance of counsel grounds. *See People v. Bullock,* 2015 WL 213132 (Mich. Ct. App. 2015).

51.     In 2016, this Court denied Mr. Bullock's habeas petition on ineffective assistance of counsel grounds, which the Sixth Circuit affirmed in 2017. *See Bullock v. Palmer*, No. 16-2136, 2017 WL 3397344 (6th Cir. May 22, 2017).

52.     In November 2024, Jamare Rucker admitted in a sworn statement that he committed the two October 20, 2011 carjackings. At the time, Rucker, along with a co-defendant, Jeremy Jackson, was serving a 33 to 60-year prison sentence for the second-degree murder of a CVS security guard in an attempted carjacking in February 2014.

53.     On May 28, 2025, the Wayne County Prosecutor's Office and Mr. Bullock's defense attorney, Michael Cobb, Jr., filed an agreed motion to vacate Mr. Bullock's conviction and to dismiss the criminal case against him.

54.     By the time of his release, Mr. Bullock had been wrongfully incarcerated for 11 years, 11 months, and 349 days for crimes he did not commit.

## The City Defendants' Custom of Tolerance or Acquiescence to Constitutional Violations & Failure to Train

55.    At all relevant times, the City Defendants were legally and constitutionally responsible for establishing, implementing, enforcing, supervising, and monitoring policies, practices, customs, and training programs to ensure that their police officers complied with the requirements of the United States Constitution.

56.    The City Defendants are liable for their failure to fulfill these non-delegable obligations.

57.    Before, during, and after January 12, 2013—the date of Mr. Bullock's arrest—the City Defendants, acting through their final policymakers, maintained, enforced, and acquiesced in customs, policies, and practices that authorized, condoned, tolerated, and approved illegal and unconstitutional conduct by their deputies, detectives, police officers, investigators, taskforce members, and command staff.

58.    These unconstitutional customs, policies, and practices included, but were not limited to, the following:

      a.    Conducting constitutionally deficient investigations into serious felony offenses, including carjackings, for the purpose of expeditiously closing cases, while deliberately failing to pursue, develop, or disclose actual leads or exculpatory evidence;

b. Knowingly and deliberately conducting unduly suggestive identification procedures, including live lineups, to manufacture probable cause and/or strengthen cases for prosecution and conviction;

c. Knowingly and deliberately withholding exculpatory and impeachment evidence, including *Brady* material, to manufacture probable cause, justify continued detention, and secure convictions;

d. Knowingly tolerating *Brady* violations and impermissibly suggestive lineups committed by officers, investigators, and taskforce members in order to improve clearance rates and conviction outcomes;

e. Permitting officers to conduct lineups without required documentation, safeguards, or procedures, despite knowing that such failures would prevent meaningful judicial review and invite unconstitutional identifications;

f. Failing to implement policies or procedures to ensure that criminal defendants are informed of related incidents, alternative suspects, and material exculpatory evidence;

g. Failing to implement and enforce policies requiring compliance with federal constitutional standards governing identification procedures;

h. Failing to train officers and investigators on how to conduct constitutionally compliant identification procedures, despite the obvious and recurring risk of wrongful identification;

i. Failing to implement, supervise, or enforce policies governing the collection, preservation, analysis, and disclosure of evidence, including exculpatory and impeachment material, to prosecutors and defense counsel;

j. Failing to discipline, sanction, or otherwise correct officers and employees, including the Defendants in this case, who concealed constitutional violations by themselves or others—thereby ratifying such conduct and encouraging its repetition;

    k.   Failing to train officers, both initially and on an ongoing basis, regarding constitutional standards governing arrests, charging decisions, and pretrial detention;

    l.   Failing to train officers to conduct reasonable, objective, and good-faith investigations, despite recurring circumstances presenting an obvious risk of constitutional violations;

    m.   Condoning and fostering an institutional culture of unconstitutional conduct, including tolerating illegal activity by officers when dealing with criminal suspects; and

    n.   Failing to adequately supervise officers, investigators, and taskforce members, including those assigned to multi-jurisdictional taskforces such as ACTION.

59.    Through their final policymakers, the City Defendants further maintained customs and policies of failing to adequately train, supervise, and discipline officers regarding constitutionally required evidence handling, disclosure obligations, identification procedures, and the prohibition against charging or detaining individuals without probable cause.

60.    The City Defendants' customs, policies, and practices—both individually and in combination—demonstrated deliberate indifference to the constitutional rights of citizens, including Mr. Bullock, and were the direct and proximate moving force behind the violations of Mr. Bullock's Fourth and Fourteenth Amendment rights.

61.    The unconstitutional acts committed against Mr. Bullock by the City Defendants' officers, deputies, investigators, and agents were undertaken

intentionally, maliciously, unlawfully, wantonly, and willfully, and without probable cause or legal justification.

62.    At all relevant times, the City Defendants knew or should have known of the unconstitutional conduct of their officers—particularly officers assigned to the ACTION taskforce—both in Mr. Bullock's case and in other similar cases, yet failed to take corrective action.

63.    In addition to the foregoing, the City Defendants are independently liable under a ratification theory of municipal liability. After being placed on actual and constructive notice of the unconstitutional conduct committed by their officers in Mr. Bullock's case—including the suppression of exculpatory evidence, the use of an impermissibly suggestive lineup, and the prosecution and continued detention of Mr. Bullock without probable cause—the City Defendants, through their final policymakers, affirmatively approved, condoned, and ratified that conduct. This ratification included, but was not limited to, failing to discipline or retrain the involved officers, allowing false and misleading evidence to remain uncorrected, defending the constitutionality of the officers' actions during and after the criminal proceedings, and permitting the wrongful conviction and imprisonment of Mr. Bullock to stand for nearly twelve years. By knowingly endorsing the unconstitutional actions of their officers after the fact, and concealing exculpatory evidence that continued to arise after the fact, the City Defendants made those

actions their own, thereby rendering the resulting constitutional violations attributable to municipal policy.

64.    The City Defendants further ratified and adopted their officers' unconstitutional conduct through their post-arrest and post-conviction litigation decisions and official positions. Despite possessing actual or constructive knowledge that Mr. Bullock's arrest, identification, prosecution, and continued detention were tainted by suppressed exculpatory evidence, impermissibly suggestive lineup procedures, and false or misleading investigative acts, the City Defendants—through their final policymakers and authorized representatives—chose to defend the officers' conduct as lawful, oppose relief sought by Mr. Bullock, and allow materially false evidence and testimony to remain uncorrected. This course of conduct included maintaining the validity of Mr. Bullock's conviction, resisting accountability for known constitutional violations, and failing to take corrective action even as evidence of innocence and systemic misconduct emerged. By affirmatively endorsing and defending the challenged conduct, the City Defendants ratified the constitutional violations and caused Mr. Bullock's wrongful incarceration to continue.

**Plaintiff's Injuries & Damages**

65.    Due to the conduct of the Defendants, Mr. Bullock suffered the following injuries and damages:

20

a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of nearly 12 years;

b. Severe emotional distress for the period from his arrest to the present, including but not limited to the emotional distress of being charged with, wrongfully convicted of, and sentenced to 30 to 70 years imprisonment for crimes he did not commit;

c. Physical manifestations of emotional distress including but not limited to sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned;

e. Loss of enjoyment of daily activities including, but not limited to, seeing his daughter grow up;

f. Loss of employment opportunity, past income, and future earning capacity;

g. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

h. Many of Mr. Bullock's injuries and damages are likely to be sustained and/or permanent; and

i. Other damages which may be revealed through discovery.

66. As a direct and proximate result of the wrongful acts and omissions of Defendants, Mr. Bullock sustained these damages.

67. The ACTION Defendants, knowing that exculpatory and/or impeachment evidence existed before Mr. Bullock's criminal trial, suppressed the

exculpatory and/or impeachment evidence to ensure that Mr. Bullock, an innocent man, was charged and convicted.

68.     The ACTION Defendants made a conscious, knowing, and intentional choice not to reveal exculpatory and/or impeachment evidence to Mr. Bullock.

69.     The ACTION Defendants either did not bring the exculpatory and/or impeachment evidence to the prosecutor's attention, or Defendants conspired with prosecutors to suppress the evidence from Mr. Bullock.

70.     The ACTION Defendants, knowing that the lineup procedures used were unduly suggestive, relied on such lineup to ensure that Mr. Bullock, an innocent man, was charged and convicted.

71.     The ACTION Defendants made a conscious, knowing, and intentional choice to rely on such unduly suggestive lineup.

72.     But for and as a proximate cause of Defendants' conduct, there would have been no probable cause for Mr. Bullock to be charged with carjacking, armed robbery, and the two weapons charges and for Mr. Bullock's detention before trial.

73.     As a result of Defendants' conduct, Mr. Bullock spent nearly 12 years wrongfully imprisoned for a crime he did not commit.

## COUNT I

### 42 U.S.C. § 1983
### Violation of Fourteenth Amendment: *Brady* Violations
### Against ACTION Defendants

74.    Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

75.    The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

76.    Suppression of material exculpatory and/or impeachment evidence favorable to the accused violates due process, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83 (1963).

77.    The ACTION Defendants conspired to and/or did withhold material exculpatory and/or impeachment evidence, including, but not limited to, evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, the accident report involving Hester, and the anonymous tip(s) directing police to Advanced Expert Collision months before Mr. Bullock ever came into possession of the vehicle.

78.     None of this suppressed material exculpatory and/or impeachment evidence was disclosed to Mr. Bullock or his defense counsel or presented during Mr. Bullock's trial.

79.     If Mr. Bullock's trial attorney had any of this material exculpatory and/or impeachment evidence at the time of trial, they would have introduced them, consistent with the defense strategy.

80.     This material exculpatory and/or impeachment evidence was obviously favorable to Mr. Bullock because the discovery of this evidence led the Wayne County Prosecutor to vacate and dismiss the charges against Mr. Bullock.

81.     The ACTION Defendants knowingly violated their duties to disclose to Mr. Bullock all material evidence for which the exculpatory and/or impeachment value was apparent.

82.     This evidence was material because "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Chenault*, 495 Mich. 142, 150, 845 N.W.2d 731, 735 (2014).

83.     The suppression of this material exculpatory and/or impeachment evidence by the ACTION Defendants caused Mr. Bullock to suffer prejudice because there is a reasonable probability that the suppressed evidence would have produced a different verdict.

84. The suppressed evidence regarding the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), title transfer history, and accident report involving Hester would have enabled Mr. Bullock to uncover and present evidence of alternate suspects in the carjacking as well as alibi evidence.

85. Moreover, the suppression of evidence related to the anonymous tip directing police to Advanced Expert Collision would have enabled Mr. Bullock to uncover and present evidence of alternate suspects in the carjacking as well as alibi evidence.

86. Had Defendants disclosed the *Brady* material, there would have been no arrest, detention, or charges brought, much less a conviction.

87. The *Brady* evidence cited above would have been apparent to any reasonable officer acting in good faith.

88. Mr. Bullock's right to be provided with exculpatory and impeachment evidence was clearly established long before Mr. Bullock was arrested, charged, and convicted.

89. The *Brady* violations committed by the ACTION Defendants resulted in Mr. Bullock not receiving a fair trial, i.e., a trial resulting in a verdict worthy of confidence.

90.    Through the suppression of this material exculpatory and/or impeachment evidence, the ACTION Defendants directly and proximately caused Mr. Bullock to be wrongfully detained for nearly 12 years and resulted in substantial damages and injury to Mr. Bullock.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT II

### 42 U.S.C. § 1983
### Violation of Fourteenth Amendment: Unduly Suggestive Lineup
### Against ACTION Defendants

91.    Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

92.    "[S]uspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Gregory v. City of Louisville*, 444 F.3d 725 746 (6th Cir. 2006) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). Unnecessarily suggestive identification violates due process when it creates a substantial likelihood of misidentification. *Ramsey v. Rivard*, 110

F.4th 860, 868–69 (6th Cir. 2024) (citing *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972)).

93.     "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200.

94.     The ACTION Defendants conspired to and/or did use unduly suggestive lineup techniques so unnecessarily suggestive as to ensure that Mr. Bullock was identified by Russell as the carjacker.

95.     Defendant Carroll conducted a live lineup with five other individuals 15 months after Russell last saw her assailant.

96.     Mr. Bullock was the only light complexioned Black man in the lineup and only one of two suspects who were 5' 9" in height. No photograph was taken of the lineup.

97.     Despite Mr. Bullock being 10 years older than the suspect and having a goatee, Russell allegedly identified Mr. Bullock as the alleged carjacker.

98.     The unduly suggestive lineup techniques employed caused, or created a substantial likelihood of, misidentification.

99.    Through the use of these unduly suggestive lineup techniques, the ACTION Defendants directly and proximately caused Mr. Bullock to be wrongfully detained for nearly 12 years and resulted in substantial damages and injury to Mr. Bullock.

100.    At all relevant times, Mr. Bullock's right to not be subject to unduly suggestive lineup techniques that create a substantial likelihood of misidentification was clearly established before Mr. Bullock was charged, detained, and convicted.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT III

### 42 U.S.C. § 1983
### Violation of Fourth & Fourteenth Amendments: Malicious Prosecution
### Against ACTION Defendants

101.    Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

102.    Mr. Bullock had a constitutional right, guaranteed by the Fourth Amendment, to be free of illegal seizure and detention without probable cause, based on false statements and/or material omissions that were knowingly or recklessly

28

made to manufacture probable cause. *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020).

103. The ACTION Defendants, acting under color of state law, were under constitutional duties to make truthful statements to the prosecutor and district court judge to establish probable cause for an arrest warrant.

104. The ACTION Defendants influenced, conspired, or participated in the initiation of Mr. Bullock's criminal prosecution by deliberately and knowingly supplying false information and/or omitting material information (which showed a reckless disregard for the truth) in requesting an arrest warrant, swearing to facts in support of probable cause, and/or testifying at the preliminary examination, which were material to a finding of probable cause.

105. The ACTION Defendants' false statements and/or material omissions included the use of an unduly suggestive police lineup as well as the omission and suppression of material exculpatory and/or impeachment evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, Hester accident report, and the alleged anonymous tip(s) directing police to Advanced Expert Collision.

106. Through the false statements and material omissions identified above, and by concocting the false narrative that Mr. Bullock had committed the carjacking,

the ACTION Defendants caused Mr. Bullock to be detained, prosecuted, convicted, and incarcerated in violation of his constitutional rights.

107.   Through the false statements and material omissions identified above, the ACTION Defendants directly and proximately caused Mr. Bullock to be wrongfully detained for nearly 12 years and resulted in substantial damages and injury to Mr. Bullock.

108.   At all relevant times, Mr. Bullock's right not to be charged without probable cause was clearly established before Mr. Bullock was charged, detained, and convicted.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT IV

**42 U.S.C. § 1983**
**Violation of Fourth Amendment: Post-Legal-Process Detention Without Probable Cause**
**Against ACTION Defendants**

109.   Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

110.    Mr. Bullock had a constitutional right, guaranteed by the Fourth Amendment, to be free of post-legal-process detention without probable cause. *See Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017).

111.    As investigative officials acting under color of state law, the ACTION Defendants had duties to refrain from engaging in acts that continued Mr. Bullock's detention without probable cause.

112.    At all times relevant, the ACTION Defendants conspired and perpetuated Mr. Bullock's continued detention when it was in their power to dissolve probable cause.

113.    The ACTION Defendants knew that the evidence used to detain Mr. Bullock was false, misleading, and/or incomplete, as they used an unduly suggestive police lineup and omitted and suppressed exculpatory and/or impeachment evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, Hester accident report, and the alleged anonymous tip(s) directing police to Advanced Expert Collision.

114.    Had the ACTION Defendants not engage in such conduct, there would have been no probable cause for Mr. Bullock's continued detention.

115.    At all relevant times, the ACTION Defendants influenced or participated in Mr. Bullock's detention by deliberately and knowingly supplying

false information and/or omitting material information which showed a reckless disregard for the truth.

116.   Through the false statements and material omissions identified above, the ACTION Defendants directly and proximately caused Mr. Bullock to be wrongfully detained for nearly 12 years without probable cause and resulted in substantial damages and injury to Mr. Bullock.

117.   At all relevant times, Mr. Bullock's right to be free of continued detention without probable cause was clearly established before he was arrested, charged, detained, and convicted.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT V

**Civil Conspiracy Under 42 U.S.C. § 1983**
**Against ACTION Defendants**

118.   Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

119.   A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). The elements of a § 1983 civil conspiracy are: "(1) a single plan

existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed" in furtherance of the conspiracy. *Id*.

120.   The ACTION Defendants had a single plan to arrest, detain, and prosecute Mr. Bullock without probable cause, including through use of an unnecessarily suggestive lineup as well as the omission and suppression of exculpatory and/or impeachment evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, Hester accident report, and the alleged anonymous tip(s) directing police to Advanced Expert Collision.

121.   The ACTION Defendants shared a conspiratorial objective to deprive Mr. Bullock of his constitutional rights under the Fourth and Fourteenth Amendments.

122.   The ACTION Defendants committed overt acts in furtherance of the conspiracy, including, but not limited to, the following:

      a.    The suppression of evidence related to the earlier carjacking of the silver Charger, including George being found in possession of the silver Charger;

      b.    The suppression of the title transfer history;

      c.    The suppression of the accident report involving Hester;

d. The suppression of the anonymous tip that the stolen black 2012 Charger was located in Dehko's shop, Advanced Expert Collision;

e. Using an unduly suggestive lineup;

f. Despite lack of probable cause, causing the initiation of charges against Mr. Bullock; and/or

g. Despite lack of probable cause, causing Mr. Bullock's continued detention and imprisonment for nearly 12 years.

123. The conspiracy to deprive Mr. Bullock of his constitutional rights directly and proximately caused Mr. Bullock to be wrongfully detained for nearly 12 years and resulted in substantial damages and injury to Mr. Bullock.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT VI

### 42 U.S.C. § 1983
### *Monell* Liability
### Against City Defendants

124. Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

125. The City Defendants may be liable under § 1983 for a custom of tolerance or acquiescence to federal violations, the elements of which are: (1) the

existence of a clear and persistent pattern of violating federal rights; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the direct causal link for the constitutional deprivation. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).

126.   As pleaded herein, the City Defendants, by and through their officers, deputies, investigators, and/or agents, implemented a practice of suppressing material exculpatory and/or impeachment evidence from the defense or jury and using unduly suggestive lineups, violating the U.S. Constitution.

127.   These illegal and unconstitutional actions and practices included but are not limited to:

    a.    Conducting inadequate investigations into serious felony cases, such as carjacking, in order to expeditiously close cases, and affirmatively choosing not to develop or pursue actual leads or evidence;

    b.    Knowingly and deliberately conducting unduly suggestive lineups in order to manufacture probable cause to charge and detain suspects and/or strengthen a case for conviction;

    c.    Knowingly and deliberately withholding exculpatory evidence in order to manufacture probable cause to charge and detain suspects and/or strengthen a case for conviction;

    d.    Knowingly tolerating *Brady* violations and unduly suggestive lineups committed by their investigators, officers, and/or staff to improve conviction rates on felony cases;

e.   Failing to have policies and procedures in place, failing to supervise or train employees as to policies and procedures, and/or failing to attend to such policies and procedures to ensure that exculpatory and impeachment evidence is provided to prosecutors and defense attorneys to prevent wrongful convictions;

f.   Failing to sanction or discipline police officers, deputies, investigators, and other employees, including the Defendants in this case, who concealed violations of the constitutional rights of citizens by others and themselves, thereby causing and encouraging others, including the Defendants in this case, to engage in unlawful and unconstitutional conduct;

g.   Failing to train, initially and periodically, and require police officers, deputies, investigators, and other employees to follow constitutional precedent and legal guidelines regarding arrest and detention of individuals;

h.   Failing to train and require its officers to conduct constitutionally compliant lineups and/or lineups in compliant with federal law;

i.   Failing to initially and periodically train and require police officers, deputies, investigators, and other employees in conducting a reasonable and objective inquiry regarding arrest and detention of individuals;

j.   Condoning and/or encouraging an atmosphere of illegal activity by police officers, deputies, investigators, and other employees when dealing with the public, including criminal suspects;

k.   Condoning and/or encouraging impermissibly suggestive lineups;

l.   Failing to supervise their police officers, deputies, investigators, and other employees.

128.   Mr. Bullock's wrongful conviction and imprisonment were caused by the City Defendants' customs, policies, and/or practices of suppressing material exculpatory and/or impeachment evidence and using unduly suggestive police lineups.

129.   For years, the City Defendants tolerated and acquiesced to a custom of constitutional violations which enabled its employees to arrest, charge, detain, and convict Mr. Bullock and others in violation of their constitutional rights.

130.   As a direct and proximate result of the City Defendants' custom of tolerance or acquiescence to constitutional violations and deliberate indifference, Mr. Bullock was charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned for nearly 12 years, causing him to suffer the injuries and damages set forth above.

**WHEREFORE**, Plaintiff seeks judgment against the City Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

<u>**COUNT VII**</u>

**42 U.S.C. § 1983**
***Monell* Liability for Failure to Train**
**Against City Defendants**

131.   Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

132.   The City Defendants can be liable under § 1983 for constitutional violations arising from their failure to train their employees properly.  *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).

133.   At all times relevant, the City Defendants had actual or constructive notice that its employees, including the ACTION Defendants, suppressed material exculpatory and/or impeachment evidence and used unduly suggestive lineups.

134.   The City Defendants foresaw, or should have foreseen, or were placed on actual or constructive notice, that people were being arrested, charged, detained and convicted for crimes they did not commit.

135.   At all relevant times, the City Defendants failed to train investigators, including the Defendant officers, of their constitutional obligations to disclose to prosecutors and criminal defense counsel material exculpatory and/or impeachment evidence and to employ lineups that were not unduly suggestive.

136.   The failures of the City Defendants to provide adequate training and supervision to investigators is shown through a pattern of similar constitutional

violations by their officers, their adherence to an approach that they knew failed to prevent tortious conduct by officers, or in the alternative, failed to train their employees to handle recurring situations presenting an obvious potential for a constitutional violation.

137.   The failures of the City Defendants to implement different or additional trainings for their officers were so apparent that their failures to do so are properly characterized as deliberate indifference to Mr. Bullock's constitutional rights.

138.   The failures of the City Defendants to adequately train their officers were the moving force of Mr. Bullock's prosecution, detention, and wrongful conviction.

139.   As a direct and proximate result of the City Defendants' failures to train and deliberate indifference, Mr. Bullock was charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned for nearly 12 years, causing him to suffer the injuries and damages set forth above.

**WHEREFORE**, Plaintiff seeks judgment against the City Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT VIII

**Gross Negligence in Violation of MCL § 691.1407
Against ACTION Defendants**

140.   Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

141.   Under Michigan law, law enforcement officers are not immune from liability for tortious conduct done in the course of their employment when that conduct amounts to gross negligence that is the proximate cause of a plaintiff's injury or damage. Mich. Comp. Laws § 691.1047(2)(c).

142.   "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. Mich. Comp. Laws § 691.1407(8)(a).

143.   At all relevant times herein, the ACTION Defendants were not acting in good faith.

144.   At all relevant times herein, the ACTION Defendants intended to, and successfully, caused the wrongfully arrest and imprisonment of Plaintiff so to avoid further scrutiny or revelation of the pervasive and ongoing criminal scheme implicating DPD officers, mechanic shops, towing companies, and other conspiring actors, including Dehko.

145.   The ACTION Defendants were under a duty to avoid engaging in conduct so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Mr. Bullock.

146.   The ACTION Defendants engaged in grossly negligent conduct in seeking the arrest, detention, and prosecution of Mr. Bullock for crimes he did not commit. Specifically, the ACTION Defendants engaged in conduct so reckless as to demonstrate a substantial lack of concern as to whether Mr. Bullock would be wrongfully arrested, detained, and convicted.

147.   The ACTION Defendants breached their duty by subjecting Mr. Bullock to criminal process without probable cause.

148.   The ACTION Defendants breached her duty by engaging in unconstitutional conduct set forth above.

149.   The grossly negligent conduct of the ACTION Defendants was the direct and proximate cause of Mr. Bullock's prosecution and detention without probable cause.

150.   As a direct and proximate result of the ACTION Defendants' conduct, Mr. Bullock suffered harm, including but not limited to severe and serious emotional distress, embarrassment, and humiliation. Mr. Bullock also suffered pecuniary damages as a result of the prosecution against him.

151.   The ACTION Defendants are liable for Mr. Bullock's injuries and damages under Mich. Comp. Laws § 691.1407.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages; punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

## COUNT IX

### Malicious Prosecution in Violation of Michigan State Law
### Against ACTION Defendants

152.   Plaintiff incorporates by reference paragraphs 1 to 73, as fully set forth herein.

153.   The ACTION Defendants directly caused the institution of the prosecution against Mr. Bullock through the use of an unduly suggestive police lineup as well as the omission and suppression of exculpatory and/or impeachment evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, Hester accident report, and the anonymous tip directing police to Advanced Expert Collision, despite having no probable cause.

154.   The prosecution of Mr. Bullock was terminated in his favor, when his convictions were vacated and the charges against him dismissed.

155.   There was no probable cause to support the prosecution of Mr. Bullock.

42

156.   The ACTION Defendants acted with malice, as the used an unduly suggestive police lineup as and suppressed exculpatory and/or impeachment evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, Hester accident report, and the anonymous tip directing police to Advanced Expert Collision for purposes other than that of securing the proper adjudication of the criminal charges.

157.   The ACTION Defendants knowingly gave false and/or misleading information through the use of an unduly suggestive police lineup as well as the omission and suppression of exculpatory and/or impeachment evidence related to the earlier carjacking of the silver Charger (including George being found in possession of the silver Charger), the title transfer history, Hester accident report, and the anonymous tip directing police to Advanced Expert Collision.

158.   As a direct and proximate result of the conduct of the ACTION Defendants, Mr. Bullock suffered harm, including but not limited to severe and serious emotional distress, embarrassment, humiliation, and loss of travel privileges. Mr. Bullock also suffered pecuniary damages as a result of the prosecution against him.

**WHEREFORE**, Plaintiff seeks judgment against the ACTION Defendants for compensatory damages, including non-economic and economic damages;

punitive damages; costs and attorney fees; and any other relief this Court deems just and equitable.

Respectfully submitted,

*/s/ Adam S. Akeel*
**AKEEL & VALENTINE, PLC**
SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
HAYDEN PENDERGRASS (P86888)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
hayden@akeelvalentine.com

DATED: December 18, 2025

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH BULLOCK,

                 Plaintiff,

                                     Case No.  25-14081

v.                                 Judge:

CITY OF GROSSE POINTE PARK, CITY
OF DETROIT, JAMES VOGLER, and FRANK
CARROLL,

                 Defendants.

---

SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (81328)
HAYDEN PENDERGRASS (P86888)
Akeel & Valentine, PLC
*Attorneys for Plaintiff*
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084-4736
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
hayden@akeelvalentine.com

---

## **JURY DEMAND**

---

    NOW COMES Plaintiff, KENNETH BULLOCK, by and through his undersigned counsel, Akeel & Valentine, PLC, and hereby demands a Trial by Jury of the above-referenced causes of action.

45

Respectfully submitted,

*/s/ Adam S. Akeel*
**AKEEL & VALENTINE, PLC**
SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
HAYDEN PENDERGRASS (P86888)
Attorneys for Plaintiff
888 W. Big Beaver Road., Suite 350
Troy, MI 48084
(248) 269-9595
shereef@akeelvalentine.com
adam@akeelvalentine.com
hayden@akeelvalentine.com

DATED: December 18, 2025